NOTICE

Opinion filed April 7, 2015.
Modified upon denial of
rehearing September 24, 2015.

2015 IL App (5th) 140069

NO. 5-14-0069

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| SINCLAIR OIL CORPORATION, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 08-MR-602 |
| | ) | |
| ALLIANZ UNDERWRITERS INSURANCE | ) | |
| COMPANY, f/k/a Allianz Underwriters, Inc., | ) | Honorable |
| | ) | Donald M. Flack, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Chapman and Schwarm concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Allianz Underwriters Insurance Company, formerly known as

Allianz Underwriters, Inc. (Allianz), appeals, pursuant to Illinois Supreme Court Rule

304(a) (eff. Feb. 26, 2010), the January 8, 2013, order of the circuit court of Madison

County which granted a partial summary judgment in favor of the plaintiff, Sinclair Oil

Corporation (Sinclair).  In said order, the circuit court made a determination that Allianz

breached its duty to defend Sinclair with respect to multiple underlying lawsuits and

claims arising out of alleged environmental contamination of soil and groundwater in

Hartford, as well as cleanup activities and alleged exposure to benzene-containing

1

products as a result of such alleged contamination (the underlying lawsuits). We restate the issues necessary to resolve this appeal as follows: (1) whether an umbrella insurance policy issued by Allianz contained a "drop down" provision that required Allianz to defend Sinclair upon exhaustion of an underlying primary policy issued by the Home Indemnity Company (the Home policy); (2) whether the underlying policy contained aggregate limits of $500,000 for bodily injury and property damage; and (3) whether the information Sinclair provided to Allianz regarding payments under the Home policy and the nature of the claims set forth in the underlying lawsuits was sufficient to trigger Allianz's "drop down" duty to defend as a matter of law. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion.

¶ 2                                    FACTS

¶ 3                          1. Undisputed Factual Background

¶ 4    A review of the record on appeal reveals the following facts, which are not in dispute. Sinclair owned and operated an oil pipeline near Hartford between 1979 and 1990. During 1981 and 1982, there are four instances on record where the pipeline leaked or spilled. Sinclair ceased operation of the pipeline in 1984, but some petroleum remained dormant in the pipeline. When Sinclair evacuated the pipeline in 1990, Sinclair discovered that more petroleum had leaked from the pipeline during its dormant stage.[1]

---

[1]The parties agree that Sinclair's five discrete polluting events contributed to, at most, a tiny fraction of the contamination in the Hartford area when compared to the

¶ 5    Contamination in and around Hartford prompted multiple lawsuits filed in Madison County, beginning in 2003, which named Sinclair along with several other entities associated with pipelines and refineries in the area as defendants (the underlying lawsuits). The underlying lawsuits include claims for property damage[2] and personal injury,[3] as well as regulatory matters relating to administrative orders issued by the United States Environmental Protection Agency and the Illinois Environmental Protection Agency (EPA) for remediation of the contamination.

¶ 6    The Allianz insurance policy at issue in this case is a commercial general liability umbrella policy with policy number AUL 5100556 (the Allianz policy), which was effective from July 31, 1981, to July 31, 1982. According to the schedule of underlying

---

contributions of other entities that owned and operated the large oil refineries around Sinclair's pipeline.

[2]Sparks v. Premcor, No. 03-L-1053 (hereinafter *Sparks*); Abert v. Alberta Energy, No. 04-L-354 (hereinafter *Abert*); Bedwell v. Premcor, No. 04-L-342 (hereinafter *Bedwell*); Village of Hartford v. Premcor, No. 08-L-637 (hereinafter *Village of Hartford*); Hopkins v. Premcor, No. 03-L-1053; and State of Illinois v. Premcor, No. 03-CH-459 (third-party complaint for contribution).

[3]Wright v. Apex Oil, No. 05-L-1210; Vostry v. Apex Oil, No. 07-L-1; Brzostowski v. Atlantic Richfield, No. 07-L-340; Schulte v. Apex Oil, No. 07-L-629; Jones v. A&E, No. 07-L-323; Smith v. Sinclair, No. 08-L-681; Peters v. Amoco, No. 09-L-56 (hereinafter *Peters*); and Johns v. Amoco, No. 09-L-136.

3

insurance appended to the Allianz policy, the primary commercial general liability policy underlying the Allianz policy was issued by Home and was effective July 31, 1981, to July 31, 1984. It is the interplay between the Allianz policy, the Home policy, and the underlying lawsuits that is at issue on appeal.

¶ 7                                    2. The Pleadings

¶ 8     Sinclair initially filed a complaint for a declaratory judgment against Allianz in the circuit court of Madison County in 2008. However, the operative complaint for purposes of this appeal is the third amended complaint, filed September 20, 2011. The third amended complaint sets forth the details of each of the underlying lawsuits. With regard to the regulatory matters, the complaint alleges that Sinclair entered into an agreement, dated April 2004, to share the costs of remediating the contamination in and around Hartford with the other entities that had operated in the area. According to the complaint, between November 2005 and December 2006, Sinclair made payments pursuant to the agreement "in excess of $3,696,000." In addition, the complaint alleges that, as of the date of the complaint, Sinclair has "paid over $3 million" defending itself in the underlying actions.

¶ 9     The complaint requests, *inter alia*, a declaratory judgment that Allianz has a duty to defend Sinclair with respect to the underlying actions, and that Allianz breached that duty by failing to defend Sinclair under a reservation of rights or seek a declaratory judgment with regard to coverage. Further, the complaint seeks a declaration by the circuit court that, because Allianz breached its duty to defend Sinclair with respect to the underlying actions, Allianz is estopped from asserting any defenses to coverage, and, as

4

such, is required to indemnify Sinclair for all sums that Sinclair has or will become legally obligated to pay as a result of the underlying actions. Alternatively, the complaint seeks a declaration that Allianz is legally obligated to indemnify Sinclair irrespective of its duty to defend.

¶ 10   Allianz filed a counterclaim for a declaratory judgment that it had no duty to defend or indemnify Sinclair with regard to the underlying lawsuits, asserting that its policy contains no such duty. In addition, Allianz asserted several defenses to coverage, including inadequate notice, failure to make a "definite claim," horizontal exhaustion, and a pollution exclusion. On October 4, 2011, Sinclair filed a motion for partial summary judgment, seeking a declaration that Allianz has a duty to defend Sinclair in the underlying actions and that Allianz breached that duty, resulting in its being estopped from asserting any defenses to coverage. In reviewing the supporting documentation appended to the motion for partial summary judgment, we begin by noting that both the Allianz policy and the Home policy are attached to the motion.[4] We will set forth the relevant language of each policy in detail below as it becomes necessary to analyze the issues on appeal.

---

[4]Sinclair's copies of the Allianz and Home policies differ slightly from Allianz's copies of these policies. However, the provisions that must be interpreted in order to resolve this appeal are identical in each party's copy, and there is no dispute as to the wording of these provisions.

¶ 11                          3. The Wyoming Lawsuits

¶ 12   Our recitation of the facts that can be determined from a review of the remaining attachments to Sinclair's motion will be presented in order to place those facts in a chronological perspective, rather than as they were presented to the circuit court. The affidavit of David Stice, a corporate attorney for Sinclair since 1991, with the exception of three years beginning in July of 1999, was presented to provide proof that Allianz was aware that the Home policy had been exhausted by prior settlements Home paid on behalf of Sinclair for the same policy that is at issue in the case at bar. In the affidavit, Mr. Stice avers that there were several lawsuits filed against Sinclair and others in the 1990s concerning "claims of bodily injury and/or property damage allegedly resulting from prior operations at Sinclair's Wyoming refinery (the Wyoming lawsuits)."[5]   According to Stice's affidavit, one of the Wyoming lawsuits[6] alleged both personal injury and property damage from exposure to materials from Sinclair's Wyoming refinery, while the other Wyoming lawsuits alleged property damage only. Through correspondence and phone calls, Allianz was kept apprised of developments in the Wyoming lawsuits and was

---

[5]*Albertson v. Dow Chemical Co.*, No. 65212 (hereinafter *Albertson*); People of the State of Wyoming v. Little America Refining Co., No. 62325 (hereinafter *People of Wyoming*); KN Energy, Inc. v. Sinclair Oil Corp., No. 93-CV-0080-B (hereinafter *KN Energy*); and United States v. Sinclair Oil Corp., No. C89-0153 (hereinafter *U.S. v. Sinclair*).

[6]*Albertson*, No. 65212.

invited to participate in settlement discussions, but declined. Stice's affidavit sets forth the details of Sinclair's settlement of each of the Wyoming lawsuits[7] and states that legal defense costs and fees for the Wyoming lawsuits exceeded $5 million.

¶ 13 The record contains intermittent correspondence between Sinclair and Allianz regarding the Wyoming lawsuits. In letters from Allianz to Sinclair dated March 28, 1991, August 13, 1991, and August 29, 1991, Allianz admitted that the Wyoming lawsuits implicated three Allianz policies, including the Allianz policy at issue in this case, effective July 31, 1981, to July 31, 1982. In these letters, Allianz states its position with regard to the Wyoming lawsuits, that the Allianz policy at issue is an excess policy, requiring exhaustion of all underlying policy limits, and that, in any case, the Allianz policy at issue contains a pollution exclusion. On March 23, 1992, Allianz sent Sinclair a letter opting not to participate in a declaratory judgment action Sinclair was preparing to commence against other insurance companies that had issued commercial liability policies to Sinclair that were potentially implicated by the Wyoming lawsuits.

¶ 14 On April 17, 1996, Sinclair sent a letter to Allianz enclosing "a copy of page 3 of the Settlement Agreement" between Home and Sinclair resolving coverage of the Wyoming lawsuits, "confirm[ing] that Home paid $3.5 million in total to Sinclair and the

---

[7]According to Stice, Sinclair settled *Albertson* for $5.25 million and settled *KN Energy* for $1 million, plus certain benefits valued at $1.25 million. Sinclair settled *People of Wyoming* and *U.S. v. Sinclair* by agreeing to perform corrective action near the Wyoming refinery and spent approximately $6 million performing said corrective action.

allocation by policy of the $3.5 million." According to the enclosed excerpt from that settlement agreement, Home and Sinclair agreed to allocate $500,000 of the settlement to the underlying Home policy at issue for the 1981-1982 policy period. All of the $500,000 was allocated to claims for property damage. The settlement agreement specifically shows that none of the $500,000 was allocated to claims for bodily injury.

¶ 15    The record contains a copy of the full settlement agreement entered into by Home and Sinclair in order to resolve coverage disputes over the Wyoming lawsuits. However, there is no indication as to whether or when the full settlement agreement was provided to Allianz. The "Settlement Agreement" states that Sinclair "owns and operates" a refinery in or near Evansville, Wyoming, and that disagreements have arisen between Sinclair and Home as to the application, if any, of the Home policy to insurance claims "arising out of alleged pollution or contamination at and emanating from the Refinery." The "Settlement Agreement" states that "demands have been made on Sinclair by *** government regulatory agencies *** as well as individuals and non-governmental entities *** in connection with alleged contamination of soil, groundwater and air at and emanating from the Refinery." However, the "Settlement Agreement" does not delineate whether all of the claims were for property damage or if any of them were for bodily injury.

¶ 16    In a largely redacted letter dated August 9, 1996, from Sinclair to Allianz, counsel for Sinclair states as follows:

    "[W]e have provided you with specific evidence from the Settlement Agreement between Home and Sinclair demonstrating that the property damage limits were

8

paid by Home for the 7/31/81-82 policy year. Accordingly, exhaustion of the Home policy underlying Allianz has occurred. You indicate that you need additional information concerning 'the nature of the claims that have been paid, and how settlement sums have been allocated to the various policy years…' We do not understand what additional information you are requesting because the information you are requesting has already been provided to you. We are glad to entertain a more specific request. For example, during a meeting on January 5, 1996, in which your representatives *** were present, the nature of the claims and how settlement sums have been allocated to various policy years were discussed in specific detail. After the meeting, [your representatives] requested additional information from Sinclair which was provided to them in a letter dated January 11, 1996. Relevant portions of the Settlement Agreement between the primary carrier, Home Insurance Company and Sinclair Oil we [*sic*] provided in the January 11, 1996[,] letter and the April 17, 1996[,] letter also references the actions being settled and how the payments by Home are being allocated.

With respect to damages, we have also previously provided you with a full breakdown. At this point, we do not understand what additional information you require. If you can be more specific, please let me know. In the January 5, 1996[,] meeting and in subsequent letters we communicated to Allianz representatives the following dollar/damages information with extensive backup:

Defense costs………………………$3,656,100

Litigation Liability…………………$10,449,000

9

Future and past cleanup costs……...$14,761,272"

Footnotes in the letter contain further breakdown of Sinclair's projected liability in the Wyoming lawsuits. According to the footnotes, Sinclair paid $5,250,000 "as settlement in the toxic tort case of *Albertson*." The other figures are noted to be projections of defense, settlement, and remediation costs in the remaining Wyoming lawsuits.

¶ 17    Other than the statements contained in the above-mentioned letters, the record contains no affidavit or other evidence indicating what information was provided to Allianz or any other specific details of the Wyoming lawsuits. In addition, the record contains no evidence showing a breakdown of payments made by Sinclair with respect to bodily injury versus property damage claims stemming from the Wyoming lawsuits. In a partially redacted letter dated October 29, 1996, from Allianz to Sinclair, counsel for Allianz stated, "Allianz does not necessarily agree with your analysis that the limits underlying the Allianz policy for the 1981-1982 term have been exhausted. We also do not necessarily agree with Home's position that their defense obligation has been relieved by their settlement."

¶ 18                                   4. The Underlying Lawsuits

¶ 19    We next set forth the evidence presented in Sinclair's motion for partial summary judgment which references the nature and status of the claims arising from the underlying lawsuits that were instituted as a result of the Hartford contamination. First, Sinclair attached the affidavit of its attorney, Joseph G. Nassif, who averred that Sinclair has provided "many updates" to Allianz regarding negotiations with other responsible parties and the EPA and "requested that Allianz pay the costs of Sinclair's participation." Mr.

Nassif also attested to Sinclair's legal fees of "over 3 million" in the underlying lawsuits and provided an evidentiary foundation for numerous letters and emails between the parties that were also attached to the motion. Finally, Mr. Nassif's affidavit directed the circuit court to a website that corroborated the fact that the underlying primary carrier, Home, was liquidated in 2003 and is insolvent. An order of liquidation for Home dated June 11, 2003, is also contained in the record.

¶ 20 A review of the correspondence attached to the motion for partial summary judgment reveals that much of the communications contained therein are redacted. However, what follows are details that can be gleaned from these communications. On December 2, 2005, Sinclair sent a letter to AON Natural Resources Risk Services (AON) which provided information in relation to its pipeline leaks in Hartford. According to the letter, the EPA ordered many of the other entities affiliated with the contamination to take emergency response actions which commenced "as early as the Fall of 2003." Sinclair was added as a participant in the cleanup as of November 18, 2005. At the time of the letter, it appears there were two property damage lawsuits on file naming Sinclair as a defendant, one which was styled as a class action and one that was filed by a group of individuals, but not in class action form. However, from the letter itself, one is not able to discern to which specific lawsuits the letter is referring.

¶ 21 On January 11, 2006, AON, on behalf of Sinclair, sent out a "Notice of Loss/Claim" to approximately 30 insurance companies, including Home and Allianz,

listing five of the underlying lawsuits[8] and stating that "these claims give rise to coverage under one or more of the insurance policies on the attached list" and purporting to be "notice in accordance with the notice terms of each policy." The letter states that a compact disc is enclosed containing copies of the complaints in *Sparks*, *Bedwell*, and *Abert*, as well as the EPA administrative order and a document explaining the status of the litigation in *Village of Hartford*. According to the letter, a review of these documents shows that Sinclair has been named as a defendant in lawsuits by owners of property in Hartford who allege Sinclair contributed to cause a toxic plume which allegedly consists of an estimated four million gallons of petroleum and/or petroleum byproducts which lie beneath their property, and that said plume has caused property damage and bodily injury to persons living in Hartford.

¶ 22 The remaining correspondence between the parties that is contained in the record took place between 2008 and 2010, between the time this action for declaratory judgment and the motion for partial summary judgment were filed. On November 12, 2008, Sinclair stated in a letter to Allianz that "[b]ased on the potential monetary exposure facing Sinclair and the money expended thus far, Allianz *** should step in and provide Sinclair the coverage afforded under the excess polic[y] identified in the enclosed complaint." On March 17, 2009, Sinclair stated in a letter that Allianz's umbrella coverage is triggered because the underlying Home policy was exhausted through

---

[8]*Sparks*, *Bedwell*, *Abert*, *Village of Hartford*, and EPA lawsuits; see footnote 2 for full names and case numbers.

12

payment of the policy limits, and enclosed a copy of the "Settlement Agreement" between Home and Sinclair in the Wyoming lawsuits. The letter states, "To date, no carrier has paid any amounts to or on behalf of Sinclair in connection with the underlying actions."

¶ 23    A March 25, 2009, letter from Sinclair to Allianz attaches the complaint in the *Peters* case and states that the complaint concerns the plaintiff's alleged workplace exposure to benzene. The letter states, "On behalf of Sinclair, we request defense and indemnification in the *Peters* case." A May 13, 2009, largely redacted email from Sinclair states, "We will provide what we believe to be consistent with our client's demand for coverage." On June 10, 2009, Sinclair provided Allianz with a report on settlement discussions with the Village of Hartford "[i]n our continuing effort to keep your clients informed of, and seek their participation in, settlement discussions with the underlying claimants."

¶ 24    On November 11, 2009, Sinclair states, "We continue to request Allianz' *** full participation in defense and indemnification in the *Wright* case and, therefore, ask that you advise us as soon as possible of your client's position towards potential settlement." On May 7, 2010, Sinclair stated in a letter to Allianz, "It is particularly egregious that Allianz *continues* to refuse to pay Sinclair's defense costs, despite the fact that Sinclair has provided Allianz with clear evidence demonstrating that all coverage underlying the policy has been exhausted." (Emphasis in original.) On August 18, 2010, Sinclair asked, "[G]iven all the information we have provided to Allianz about the underlying actions as well as documents establishing Allianz' insurance obligations, what is Allianz' basis for

13

not defending?"

¶ 25        5.  Proceedings and Orders of the Circuit Court and on Appeal

¶ 26  After full briefing by the parties, oral argument on Sinclair's motion for partial summary judgment was held in the circuit court, the Honorable Barbara J. Crowder presiding, on July 31, 2012. During argument, counsel for Sinclair represented to Judge Crowder that both the property damage and bodily injury aggregate limits of the Home policy were exhausted by virtue of the Wyoming lawsuits. According to Sinclair's counsel, the property damage limits were paid by Home and the bodily injury limits were paid by Sinclair. Counsel for Allianz indicated that Sinclair sought coverage for the underlying lawsuits from Home up to the point of its insolvency in 2003. Judge Crowder took the motion under advisement, and on January 8, 2013, entered a detailed order that, *inter alia*, partially granted Sinclair's motion for summary judgment, as further detailed below.

¶ 27  First, Judge Crowder found that Allianz had a duty to defend Sinclair in the underlying actions pursuant to a "drop down" provision in its policy once the Home policy limits were exhausted so long as the claims bring the underlying actions within the coverage of the policy, and that the "claims listed" by Sinclair were for bodily injury and property and fall within the definition of "occurrence" found in the Home policy. Judge Crowder defined the second issue as "whether Sinclair established that the underlying Home [p]olicy was exhausted, or at least that it advised Allianz that Sinclair thought the Home policy was exhausted." Judge Crowder then found that the aggregate limits of the Home policy were $500,000 for each type of liability, reasoning that "these limits are

14

clearly stated on the Schedule of Coverage and on the Certificate of Insurance for the Home policy."

¶ 28   With regard to exhaustion, Judge Crowder determined that the payment by Home pursuant to the settlement of the Wyoming lawsuits exhausted the property damage limits of the underlying Home policy.  Judge Crowder then recognized Sinclair's claim during oral argument that it made payments in settlement of the Wyoming lawsuits that exhausted the bodily injury limits of the policy.  According to Judge Crowder, "[e]ven if there was a question concerning the exhaustion of the bodily injury limits, Sinclair's alerting Allianz to the possibility of exhaustion advised Allianz of the need to take action or to be prepared to fulfill its duty for claims covering the 1981-82 policy period."

¶ 29   As to the duty to defend, Judge Crowder found that when Sinclair first provided Allianz notice of the underlying lawsuits in January 2006, Allianz was required to offer a defense, make a reservation of rights, or file a declaratory judgment.  Because it took none of these actions, Judge Crowder determined that, "[a]t a minimum," Allianz is liable to pay Sinclair's defense costs and reasonable attorney fees in the underlying actions after the date Sinclair provided notice in January 2006.  Judge Crowder declined to grant a request for fees incurred prior to that date "at this time."  Finally, although Judge Crowder found that Allianz "inexorably" breached its duty to defend, she stated that she was not convinced that the law requires Allianz to be estopped from raising coverage

15

defenses, and reserved ruling on that issue pending further briefing by the parties.[9] Judge Crowder ordered Allianz to pay Sinclair's past legal fees and defense costs for all of the underlying actions incurred after January 11, 2006, and to reimburse Sinclair's ongoing legal fees and defense costs on a timely basis for those underlying actions that have not yet been resolved.

¶ 30    On February 8, 2013, Allianz filed a motion to reconsider the circuit court's order. The circuit court, the Honorable Donald Flack presiding, entered an order on July 19, 2013, denying the motion to reconsider. On January 24, 2014, the parties filed a joint motion for a finding, pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), that there is no just reason for delaying either enforcement or appeal of the January 8, 2013, order granting, in part, Sinclair's motion for a partial summary judgment. The parties also requested a stay of the proceedings pending the outcome of the appeal. Judge Flack granted that motion on January 24, 2014, and Allianz filed a timely notice of appeal on February 18, 2014.

¶ 31    On April 7, 2015, this court issued its original opinion resolving the issues on appeal. On April 30, 2015, Allianz filed a petition for rehearing. After full briefing by both parties regarding the issues raised in the petition for rehearing, we now issue this

---

[9]It is important to note that this court declines to deliver an advisory opinion as to this issue, as it was reserved by the circuit court, and therefore not within the scope of our review. See *People v. Dunmore*, 2013 IL App (1st) 121170, ¶ 12 (appellate court will not render an advisory opinion (citing *People v. Campa*, 217 Ill. 2d 243, 269 (2005))).

16

modified opinion upon denial of rehearing.

¶ 32                              ANALYSIS

¶ 33                         1.  Standard of Review

¶ 34    Because this is an appeal from an order granting, in part, a motion for partial summary judgment, our standard of review is *de novo*.  *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).  A circuit court should only grant a motion for summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *Id.*  Summary judgment is a drastic remedy and should only be granted when the movant's right to the judgment is clear and free from doubt.  *Id.*  Summary judgment is not appropriate in situations where a reasonable person could draw different inferences from the facts contained within the record.  *Id.*  With these standards for our review in mind, we move to the first issue presented by this appeal.

¶ 35                2.  Allianz Policy Language Regarding "Drop Down"

¶ 36    The first issue on appeal is whether the Allianz umbrella policy contained a "drop down" provision which requires it to defend Sinclair in the event the underlying Home policy is exhausted.[10]  Before turning to the policy language at issue, it is important to note the basic principles we use in interpreting an insurance policy.  First, in construing an insurance policy, it is the job of this court to ascertain the intent of the parties.

_____

[10]Allianz conceded this issue at oral argument.  However, because the issue was fully briefed, we will set forth our analysis for the sake of clarity.

17

*Outboard Marine Corp.*, 154 Ill. 2d at 108. In order to determine the meaning of the language of the policy and the intent of the parties, we must read the insurance policy as a whole, while giving consideration to the type of risk involved, the subject matter that is insured, and the purposes of the insurance contract. *Id.* If the language of the policy is unambiguous, we must give the language its plain and ordinary meaning. *Id.* It is only if the words in the policy are susceptible to more than one reasonable interpretation that we will find the language to be ambiguous and construe them in favor of the insured. *Id.* at 108-09.

¶ 37 The provisions of the Allianz umbrella policy that must be construed in order to determine whether Allianz had a "drop down" duty to defend Sinclair upon exhaustion of the limits of the underlying Home policy are as follows. The Allianz umbrella policy, under the heading "Insuring Agreements," section I, entitled "Coverage," states that "[t]he Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by the reason of the liability *** for damages on account of: A. Personal Injuries; B. Property Damage; C. Advertising Liability." In section II, entitled "Limits of Liability−Retained Limit," the Allianz policy provides as follows:

> "In the event of *** exhaustion of the aggregate limits of liability applicable to the underlying insurance (listed in the Schedule of Underlying Insurance hereof) by reasons of losses paid thereunder, this policy shall, subject to the terms and conditions of the underlying insurance,
>
> ***

18

(b) in the event of exhaustion continue in force as underlying insurance."

¶ 38 In addition, an amendatory endorsement to the policy, entitled "ASSISTANCE AND COOPERATION," states:

"*EXCEPT AS PROVIDED IN INSURING AGREEMENT II WITH RESPECT TO THE EXHAUSTION OF THE AGGREGATE LIMITS OF UNDERLYING POLICIES LISTED IN THE SCHEDULE OF UNDERLYING INSURANCE*, THE COMPANY WILL NOT BE CALLED UPON TO ASSUME THE SETTLEMENT OR DEFENSE OF ANY CLAIM \*\*\*." (Emphasis added.)

¶ 39 Allianz argues that because the "Coverage" provision only contains a promise to indemnify Sinclair, no duty to defend Sinclair exists in any instance. We agree with the circuit court that this position is untenable. We must look at the terms of the policy as a whole, and the plain language of the above-quoted policy provision states that if the primary insurance in the underlying schedule is exhausted by reasons of payment of losses, the Allianz policy will, "subject to the terms and conditions of the underlying insurance, \*\*\* continue in force as underlying insurance." The parties do not dispute that the Home policy was the only comprehensive general liability insurance in the schedule attached to the Allianz policy, and they do not dispute that the terms of the Home policy contained a duty to defend. Accordingly, the circuit court was correct in its determination that there is a drop down provision in the Allianz policy which required Allianz to defend Sinclair in the event of exhaustion of the aggregate limits of the Home policy.

19

¶ 40          3. Aggregate Limits of Underlying Home Policy

¶ 41   Having determined that the Allianz policy required Allianz to defend Sinclair with respect to the underlying lawsuits in the event of exhaustion of the aggregate limits of the Home policy, we turn to the parties' disagreement on the meaning of the policy schedule and terms defining aggregate limits. While the circuit court agreed with Sinclair's position that the aggregate limit for all claims was $500,000, Allianz argues that the Home policy contains aggregate limits for bodily injury and property damage resulting from certain types of occurrences, and that the underlying lawsuits do not fall into the category of claims that contain aggregate limits. For a determination of this issue, we examine the underlying Home policy.

¶ 42   In examining the underlying Home policy, we must first set forth a description of the page of the policy entitled "SCHEDULE." A preamble paragraph to a chart purporting to show "Coverages" and "Limits of Liability" for "Each occurrence" and "Aggregate," as well as "Description of Hazards," states that "[t]he insurance afforded is only with respect to such of the following Coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage shall be as stated herein, *subject to all the terms of this policy having reference thereto*." (Emphasis added.) The chart provides that, with respect to "Coverage A- Bodily Injury Liability," the "Limits of Liability" for "each occurrence" is "$500,000," and for "aggregate" is "$500,000." With respect to "Coverage B- Property Damage Liability," the chart also provides that the "Limits of Liability" for "each occurrence" is "$500,000," and "aggregate" is "$500,000." The "Description of Hazards" showing a

20

premium paid include "Premises-Operations" and "Innkeepers." However, the schedule notes that "Independent Contractors" and "Completed Operations-Products" are included in the premium.

¶ 43 Having set forth in detail the information contained within the "Schedule," we move to the terms of the policy that have "reference thereto." These terms are set forth in the policy as follows, with our emphasis added as to language that is critical to our analysis of the issue of the aggregate limits:

> "III. LIMITS OF LIABILITY
>
> Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows:
>
> *Coverage A-* The *total liability* of the company for all damages, including damages for care and loss of services, *because of bodily injury* sustained by one or more persons *as a result of any one occurrence* shall not exceed the *limits of liability stated in the schedule as applicable to 'each occurrence.'*
>
> Subject to the above provision respecting 'each occurrence,' the *total liability* of the company *for all damages because of* (1) *all bodily injury included within the completed operations hazard and* (2) *all bodily injury included within the products hazard* shall not exceed the *limit of bodily injury liability stated in the schedule as 'aggregate.'*

21

*Coverage B-* The *total liability* of the company *for all damages because of all property damage* sustained by one or more persons or organizations *as the result of any one occurrence* shall not exceed the *limit of property damage liability stated in the schedule as applicable to 'each occurrence.'*

Subject to the above provision respecting 'each occurrence,' the *total liability* of the company for *all damages because of all property damage to which this coverage applies and described in any of the numbered subparagraphs below shall not exceed the limit of property damage liability stated in the schedule as 'aggregate.'*

(1) all property damage *arising out of premises or operations rated on a remuneration basis or contractor's equipment rated on a receipts basis*, including property damage for which liability is assumed under any incidental contract relating to such premises or operations, but excluding property damage included in subparagraph (2) below;

(2) all property damage *arising out of and occurring in the course of operations performed for the named insured by independent contractors* and general supervision thereof by the named insured, including any such property damage for which liability is assumed under the incidental contract relating to such operations, but this subparagraph (2) does not include property damage arising out of maintenance or repairs at premises owned by or rented to the named insured or structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

(3) *all property damage included within the products hazard and all property damage included within the completed operations hazard.*

*Such aggregate limit shall apply separately to the property damage described in subparagraphs (1), (2) and (3) above, and under subparagraphs (1) and (2), separately with respect to each project away from premises owned by or rented to the named insured.*

Coverages A and B- For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."  (Emphasis added.)

¶ 44   Our reading of the above-quoted language from the Home policy leads us to conclude that in order to determine how a "per occurrence" limit is identified, as well as which claims have an "aggregate" limit as stated in the schedule, one must turn to the explanation of those terms which is contained within the policy itself.  The schedule itself contains this caveat, directing the reader to "the terms of the policy which make reference thereto."  Turning to the terms of the policy, it is clear that the language making reference to the schedule is intended to set forth the circumstances under which the "per occurrence" limit applies and the circumstances under which the "aggregate" limit applies.  It is also clear that while the "per occurrence" limit is subject to the same definition for bodily injury and property damage, the language setting forth the circumstances under which the "aggregate" limit applies contains substantially different language.  From this differing language, we invariably conclude that only certain types of

23

claims are subject to an aggregate limit under the policy, and that there is a distinction made between the types of bodily injury claims and the types of property damage claims that are subject to an aggregate limit. Accordingly, Sinclair is incorrect in its position that all claims are subject to a $500,000 aggregate limit, and we must further examine the policy language to determine which types of claims are subject to such a limit.

¶ 45 Under the terms of the Home policy which specify the types of claims that have an aggregate limit, we first turn to the terms explaining the types of claims for bodily injury, under "Coverage A," that have aggregate limits. The language explaining the limits of liability for "Coverage A," which is bodily injury, states that liability for bodily injury included within the "completed operations hazard" and "products hazard" is not to exceed the limits set forth in the schedule as "aggregate." "Completed operations hazard" and "products hazard" have meanings that are specified in the definitions section of the policy. In contrast, the language explaining the limits of liability for "Coverage B," which is property damage, states that "all damages because of all property damage to which this coverage applies and described in any of the numbered subparagraphs below shall not exceed the limit of property damage liability stated in the schedule as 'aggregate,' " and that the aggregate limit "shall apply separately to the property damage described in subparagraphs (1), (2) and (3) above, and under subparagraphs (1) and (2), separately with respect to each project away from premises owned by or rented to the named insured."

¶ 46 From a comparison of the provisions governing "aggregate" limits with respect to bodily injury and property damage, we conclude that the only claims for bodily injury

24

that are subject to an "aggregate" limit are claims arising under the "completed operations hazard" and "products hazard," as defined in the policy. All other claims for bodily injury are subject to the "per occurrence" limit. In contrast, it is difficult to ascertain from the policy language whether all property damage claims are subject to an "aggregate" limit, with some types of property damage claims having a separate "aggregate" limit, as enumerated in the subparagraphs, or whether only those types of property damages claims that are enumerated in the subparagraphs are subject to an aggregate limit. In either case, in order to determine which "aggregate" limit applies to a particular claim for property damage, one must determine the type of occurrence from which the claim for property damages arises.

¶ 47    Based on the foregoing, potential aggregate limits for property damage under the Home policy can be broken down as follows: (1) property damage arising out of premises or operations rated on a remuneration basis or contractor's equipment rated on a receipts basis, with a separate aggregate limit for such damage with respect to each project taking place away from the insured's premises; (2) property damage occurring in the course of operations performed by independent contractors, subject to some specified limitations, with a separate aggregate limit for such damage with respect to each project taking place away from the insured's premises; and (3) property damage included within the products hazard and completed operation hazard. We find the policy language ambiguous with regard to whether all other property damage has an aggregate limit. Nevertheless, the circuit court erred in its determination that the underlying Home policy contained aggregate limits of $500,000 for all claims. Instead, the only construction of the Home

25

policy that accounts for all of the policy language and construes the policy as a whole (see *Outboard Marine Corp.*, 154 Ill. 2d at 108-09) requires a determination of whether any particular claim is subject to an aggregate limit according to the analysis set forth above, and as summarized in the following table:

| **Bodily Injury**: | Bodily Injury arising from "Completed Operations Hazard" $500,000 Aggregate Limit | Bodily Injury arising from "Products Hazard" $500,000 Aggregate Limit | All other Bodily Injury claims subject to "Per Occurrence" Limit Only | |
|---|---|---|---|---|
| **Property Damage:** | "Property damage arising out of premises or operations rated on a remuneration basis or contractor's equipment rated on a receipts basis" $500,000 Aggregate Limit with a separate $500,000 Aggregate Limit for each project taking place away from insured's premises | "Property damage occurring in the course of operations performed by independent contractors" subject to limitations specified in subparagraph (2) of section III "Limits of Liability" $500,000 Aggregate Limit with a separate $500,000 Aggregate Limit for each project taking place away from insured's premises | Property Damage arising from "Completed Operations Hazard" and "Products Hazard" $500,000 Aggregate Limit | All other Property Damage Ambiguous as to Whether $500,000 Aggregate Limit Applies |

¶ 48      4. Duty to Defend of Umbrella Carrier Under "Drop Down"

¶ 49  Having made the foregoing analysis of the aggregate limits under the Home policy, we must decide whether the information Sinclair provided to Allianz regarding payments under the Home policy, as well as the nature of the claims set forth in the underlying lawsuits, was sufficient to trigger an excess carrier's "drop down" duty to defend as a matter of law. In Illinois, the duty to defend is much broader than the duty to indemnify. *Outboard Marine Corp.*, 154 Ill. 2d at 125. Our courts have held that in

order to determine whether an insurer's duty to defend has arisen, the court must compare the allegations of the underlying complaint to the policy language. *Id.* If the court determines, after construing the allegations of the complaint liberally in favor of the insured, that the allegations fall within, or *potentially* within, the policy's coverage, the insurer has a duty to defend the insured against the underlying complaint. *Id.* As such, this court has stated as follows:

> "When a complaint against an insured alleges facts that bring the action within or potentially within the scope of insurance policy coverage, the insurer taking the position that the complaint is not covered by the policy must defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage." *Korte Construction Co. v. American States Insurance*, 322 Ill. App. 3d 451, 457 (2001) (citing *State Farm Fire & Casualty Co. v. Martin*, 186 Ill. 2d 367, 371 (1999)).

¶ 50    In addition to the foregoing, this court has held that if an insured tenders to an insurer the defense of a cause that meets the above-quoted "four corners of the complaint" rule, and the insurer refuses to participate in the litigation, instead waiting for the insured to institute litigation against the insurer to determine the insurer's rights and duties, the insurer is estopped from raising noncoverage as a defense in that litigation. *Id.* at 458. However, it is important to note that these rules and standards have been set forth in cases involving a primary insurer, in which the policy at issue contains a "first dollar"

27

duty to defend.[11]  Accordingly, the test that has been set forth by our courts regarding the duty to defend assumes that the only prerequisite to the duty to defend is "coverage." Pursuant to this test, we find that Allianz's arguments related to whether a limitation or exclusion in its policy applies to bar coverage of the underlying lawsuits, including its arguments regarding timeliness of notice, horizontal exhaustion, the pollution exclusion, and whether Sinclair made a "definite claim," are the types of coverage questions of which, if the "drop down" duty to defend were triggered, Allianz was required to seek a judicial determination.  As such, these arguments are irrelevant to our disposition of this appeal.  However, in a case such as this, where the issue concerns an umbrella carrier, and the duty to defend under the policy is only triggered by the exhaustion of an underlying policy pursuant to a "drop down" provision, we find that an additional threshold standard concerning exhaustion should be required before the umbrella insurer comes under a legal obligation to defend under a reservation of rights or to file a declaratory judgment action.

¶ 51  In determining an appropriate threshold standard for triggering an umbrella carrier's duty, under a "drop down" provision, to defend its insured under a reservation of rights or to file an action for a declaratory judgment, we seek to balance Illinois public

---

[11]Although the policy at issue in *Korte* had an "other insurance" clause that stated that " '[t]his insurance is excess over: [a]ny other insurance provided to you on a primary basis,' " the policy in *Korte* was not an "umbrella policy," but was a primary policy containing a first line duty to defend.  *Korte*, 322 Ill. App. 3d at 454.

28

policy, which places the burden on the insurer to have coverage defenses adjudicated, with the expectations of the parties to an umbrella insurance contract such as the one at issue here. In so doing, our focus is on the information that must be provided to the umbrella carrier concerning the exhaustion of the underlying policy limits. We find our supreme court's decision in *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317 (1998), to be instructive. In that case, the court was called upon to consider whether an insurer had a duty to defend its insured without a specific request for a defense. *Id.* at 323-24. The supreme court held that "where the insured has not knowingly decided against an insurer's involvement, the insurer's duty to defend is triggered by actual notice of the underlying suit, regardless of the level of the insured's sophistication." *Id.* at 329. The court further defined "actual notice" as "notice sufficient to permit the insurer to locate and defend the lawsuit" (internal quotation marks omitted), in that "the insurer must know both that a cause of action has been filed and that the complaint falls within or potentially within the scope of the coverage of one of its policies." *Id.* at 329-30.

¶ 52 We find that a similar standard is appropriate in order to impose a duty on an umbrella carrier to defend the insured upon exhaustion of the underlying limits under a "drop down" provision. Accordingly, we hold that, in order to trigger such a duty to defend, the umbrella carrier must have "actual notice" of the potential exhaustion of the aggregate limits of the underlying insurance policy. We find that "actual notice" is notice sufficient to allow the insurer to make a preliminary determination that the limits of the underlying insurance policy have potentially been exhausted as to the claim or claims for which the insured is seeking coverage. The umbrella insurer is entitled to more than an

29

insured's allegation of exhaustion. At a minimum, the insurer must be in possession of some evidence of actual payments, made by the underlying insurance company *or the insured*, that potentially meet or exceed the aggregate limits of the underlying policy that is applicable to the claim for which the insured is seeking coverage.[12] Once the umbrella carrier is in possession of such evidence of payments made, the burden is on the insurer to resolve any potential issues regarding exhaustion. At that point in time, if the complaint comes within the potential coverage of the excess policy, the umbrella insurer has a duty to defend the insured. Accordingly, if the umbrella carrier wishes to litigate the issue of underlying exhaustion or assert any other defense to coverage, it must defend the insured under a reservation of rights or seek a declaratory judgment. See *Korte*, 322 Ill. App. 3d at 457 (citing *Martin*, 186 Ill. 2d at 371).

¶ 53    Having determined the appropriate standard to be employed in this case, we turn to the record to determine whether summary judgment in favor of Sinclair regarding Allianz's duty to defend is appropriate at this stage of the proceedings. We note at the outset that because we have found that the underlying Home policy contains aggregate

---

[12]It is important to emphasize that payments by the insured that exceed the underlying policy limits are also to be considered exhaustion. To require the payments to be made out of the primary insurer's coffers would preclude excess coverage under an umbrella policy when the primary insurer has become insolvent or has wrongfully withheld payment. See *Emhart Industries, Inc. v. Home Insurance Co.*, 515 F. Supp. 2d 228, 244 (D.R.I. 2007).

limits for specific types of claims, and that we must differentiate the types of claims containing aggregate limits as between bodily injury and property damage, we must separate our analysis of Allianz's duty to defend accordingly. As such, we will first determine whether there is evidence in the record to determine, as a matter of law, that Allianz had some evidence of payments, either by Home or by Sinclair, of the aggregate limits of the bodily injury coverage of the Home policy so as to trigger Allianz's duty to defend upon notice of the underlying lawsuits containing claims of bodily injury.[13] Then, we will conduct the same analysis as to the underlying lawsuits containing claims for property damage.

¶ 54 Having carefully considered the record, it is clear that there is insufficient evidence, at this stage in the proceedings, to determine whether Allianz had possession of some evidence of payments, either by Sinclair or by Home, of the $500,000 aggregate limits of the policy for claims of bodily injury. As set forth above, bodily injury claims only have an aggregate limit if they are included in the "completed operations hazard" or "products hazard," as those terms are elsewhere defined in the policy. The parties have not briefed the issue of whether the bodily injury claims arising from the Wyoming lawsuits fit within these definitions such that they would even have an aggregate limit. In

---

[13]If it is determined that Allianz did have the duty to defend, there must also be evidence in the record to determine when the duty was triggered and when it received "actual notice" of each lawsuit in order to determine those defense costs for which Allianz is liable.

addition, it is clear that the Home settlement covering the Wyoming lawsuits was allocated to property damage claims only. Further, although there is evidence that Sinclair made substantial payments of its own to settle the Wyoming lawsuits, there is no evidence of which payments were made for claims of bodily injury and whether Allianz was provided evidence of any such payments. Accordingly, there are genuine issues of material fact that must be resolved in order to determine whether the Wyoming lawsuits exhausted bodily injury limits contained within the underlying Home policy.

¶ 55 Assuming that there was proof in the record that payments made for bodily injury claims arising from the Wyoming lawsuits concerned the "completed operations hazard" or "products hazard," in order for Allianz to have a duty to defend bodily injury claims out of the underlying lawsuits in Hartford, the oil spill leaks would have to also have arisen from the "completed operations hazard" or "products hazard." Otherwise, under the terms of the Home policy, bodily injury claims are subject only to a "per occurrence" limit. Again, the parties have not briefed the issue of whether the bodily injury claims arising from the underlying lawsuit fell within these definitions such that they were subject to an aggregate limit. The only way in which there can be a finding that Allianz breached its duty to defend Sinclair with regard to the bodily injury claims is if Sinclair can prove that the bodily injury claims arising from the Wyoming lawsuits and the underlying lawsuits were subject to an aggregate limit under the Home policy, and that Allianz had possession of some evidence of payments made by either Sinclair or Home of

32

$500,000 or more.[14] There is insufficient evidence in the record to make these findings at this time.

¶ 56    The facts in the record are much different with regard to the claims for property damage.  Under our interpretation of the underlying Home policy, the issue of whether all property damage claims are subject to the $500,000 aggregate limit requires the resolution of an ambiguity in the underlying Home policy language.  What is clear is that some property damage claims have separate aggregate limits, as set forth above.  The parties do not dispute that Home made a $500,000 payment in settlement of its coverage dispute with Sinclair over the Wyoming lawsuits, and specifically allocated that entire amount to claims of property damage.  The record shows that Sinclair sent Allianz some evidence of this payment in the form of the settlement agreement in 1996, claiming that

---

[14]We note that there is evidence in the record that Sinclair has expended over $3 million to defend the underlying lawsuits.  Under the standards set forth in this opinion, Allianz would be required to defend Sinclair once it had possession of some evidence that Sinclair's payments on bodily injury claims exceeded the $500,000 "per occurrence limit" of the underlying policy.  However, it is unclear from the record as to what part of Sinclair's payments have been for bodily injury claims, whether said payments exceed $500,000, and if so, whether Allianz had some evidence of said payments in its possession prior to filing its counterclaim for a declaratory judgment.  If all of these conditions were met, a breach of the duty to defend would have occurred within a reasonable time after the information came into Allianz's possession.

the underlying limits had been exhausted. Allianz does not dispute that it was in possession of this information. Accordingly, when Allianz received "actual notice" of the underlying lawsuits, which included claims for property damage, the questions that needed to be answered in order to ascertain exhaustion were whether the underlying lawsuits fell within one of the categories of claims listed in the Home policy as having a separate aggregate limit, and, if not, whether the Home policy language should be interpreted to provide for an aggregate limit for all other property damage claims. We find that this amounts to evidence of payments that potentially exhausted the underlying insurance. We find that when there is an ambiguity in the underlying policy regarding categories of aggregate limits, the burden is on the insurer to resolve that ambiguity, as the umbrella carrier is in the best position to resolve the ambiguity in the underlying policy prior to issuing an umbrella policy dependent on exhaustion of the underlying aggregates. If the ambiguity as to the aggregate limits remains, as in the case at bar, once an issue of exhaustion is raised by evidence of payments of the aggregate amount, the burden is on the insurer to defend under a reservation of rights or filing a declaratory judgment action.

¶ 57    Here, despite having possession of evidence of payments of $500,000 for property damage, Allianz did nothing to resolve any issues remaining regarding exhaustion of the underlying policy limits. Allianz did not seek information to enable it to determine which category of claims the Wyoming lawsuits and the Hartford lawsuits would be considered as under the Home policy, and it did not seek a judicial determination of the ambiguity regarding property damage aggregates in the Home policy. Accordingly, we

find that Allianz breached its duty to defend Sinclair with regard to the property damage claims arising out of the underlying lawsuits.[15]  Thus, the circuit court was correct in finding that Allianz was liable for defense costs from the time it received actual notice of the lawsuits in 2006, but only those defense costs related to the claims for property damage.

¶ 58                                    CONCLUSION

¶ 59    In conclusion, and for the foregoing reasons, we find that the circuit court erred when it found adequate evidence in the record to prove, as a matter of law, that Allianz breached its duty to defend Sinclair on any claims for bodily injury arising from the underlying lawsuits.  However, for the reasons stated herein, we affirm the circuit court's determination that Allianz breached its duty to defend Sinclair with respect to the property damage claims, and as such, is liable for defense costs Sinclair has incurred defending the property damage claims from the time it gave Allianz notice of said claims in 2006.    Accordingly, we affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion, in which the circuit court, *inter alia*, determines the amount of attorney fees attributable to the property damage claims in the

---

[15]The circuit court reserved ruling on whether Allianz would be estopped from asserting policy defenses to coverage by virtue of its breach of the duty to defend.  As set forth in footnote 9, we decline to set forth an advisory opinion on this issue.  See *People v. Dunmore*, 2013 IL App (1st) 121170, ¶ 12 (appellate court will not render an advisory opinion (citing *People v. Campa*, 217 Ill. 2d 243, 269 (2005))).

underlying actions, and makes a determination, after further development of the record based on the analysis set forth above, regarding Allianz's duty to defend Sinclair with regard to the bodily injury claims.

¶ 60    Affirmed in part and reversed in part; cause remanded.

2015 IL App (5th) 140069

NO. 5-14-0069

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| SINCLAIR OIL CORPORATION, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 08-MR-602 |
| | ) | |
| ALLIANZ UNDERWRITERS INSURANCE | ) | |
| COMPANY, f/k/a Allianz Underwriters, Inc., | ) | Honorable |
| | ) | Donald M. Flack, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:**             April 7, 2015
**Modified Upon Denial of Rehearing:**     September 24, 2015

_____

**Justices:**       Honorable James R. Moore, J.

Honorable Melissa A. Chapman, J., and
Honorable S. Gene Schwarm, J.,
Concur

_____

**Attorneys**     Kristi S. Nolley, David M. Alt, BatesCarey LLP, 191 North Wacker
**for**         Drive, Suite 2400, Chicago, IL 60606; Daniel L. Bradley, DeFranco
**Appellant**     & Bradley, P.C., 141 Market Place, Suite 104, Fairview Heights, IL 62208

_____

**Attorneys**     Bernard Y. Ysursa, Cook, Ysursa, Bartholomew, Brauer & Shevlin, Ltd.,
**for**         12 West Lincoln Street, Belleville, IL 62220; Joseph G. Nassif, Ron
**Appellee**     Hobbs, Husch Blackwell LLP, 190 Carondelet Plaza, Suite 600,
St. Louis, MO 63105

_____